UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X     Index No.:
COLLEEN TURKOT,

                Plaintiff,                                              **COMPLAINT**

   -against-

ZOLL MEDICAL CORP.,                                        Plaintiff Demands
                                                               a Trial By Jury
                Defendant.
------------------------------------------------------------X

Plaintiff, by and through her attorneys, Phillips & Associates, PLLC, hereby complains of Defendant ZOLL MEDICAL CORP. ("ZOLL"), upon information and belief, as follows:

## NATURE OF THE CASE

1. Defendant ZOLL markets itself to prospective employees with the statement: "Our mission to help save lives starts with our people. Bring your authentic self to work and be part of a culture that cares."[1] However, this appreciation for authenticity apparently does not extend to all employees. This case is about one of Defendant Zoll's high performing sales employees, who was subjected to rampant retaliation after she raised concerns regarding the authenticity of a medical device order.

2. Plaintiff complains pursuant to the Family Medical Leave Act ("FMLA"), the New York State Executive Law ("NYSHRL"), the Administrative Code of the City of New York ("NYCHRL"), and the New York Labor Law § 740 ("NYLL 740"), based upon the supplemental jurisdiction of this Court pursuant to *Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking damages to redress the injuries she has suffered as a result of being discriminated against by her employer on the basis of her sex/gender and actual and/or

---

[1] https://careers.zoll.com/being-here.

perceived disability, together with creating a hostile work environment, retaliation, whistleblower retaliation, and constructive discharge.

## JURISDICTION AND VENUE

3. The Court has jurisdiction pursuant to 29 U.S.C. § 2601, *et seq.*, 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction thereto pursuant to 28 U.S.C. § 1367.

4. This action involves a Question of Federal Law.

5. The Court also has jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that there is complete diversity of citizenship, and the matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00.

6. Venue is proper in this district based upon the fact that a substantial part of the events and omissions giving rise to the claim occurred within the Southern District of New York. 28 U.S.C. §1391(b).

## PARTIES

7. Plaintiff is a female resident of the State of New Jersey, County of Morris.

8. At all times material, Defendant ZOLL was and is a foreign business corporation duly incorporated under the laws of the State of Massachusetts.

9. At all times material, Defendant ZOLL was not and is not authorized to conduct business in the State of New York, but does conduct business in the State of New York.

10. At all times material, Defendant ZOLL was and is a medical device and software solutions company headquartered at 269 Mill Rd., Chelmsford, MA 01824.

11. At all times material, Plaintiff was an employee of Defendant ZOLL.

12. At all times material, Plaintiff was a qualified employee under the FMLA in that she worked at least 1,250 hours during the 12-month period immediately preceding her request for leave.

13. At all times material, Defendant MARC was and is a qualified employer under the FMLA and employed at least 50 employees within 75 miles of Plaintiff's workplace.

## MATERIAL FACTS

14. In or around October 2020, Plaintiff began working for Defendant ZOLL as a Territory Manager in New York City.

15. In that role, Plaintiff worked closely with hospital nursing staff, case management teams, and administrative staff, to sell Defendant ZOLL medical devices and provide product training, clinical education, and order management.

16. For the first few years of her employment, Plaintiff consistently received positive reviews without any concern for her performance.

17. However, Defendant ZOLL began to subject Plaintiff to rampant retaliation after she raised concerns about a medical device order form that she reasonably believed to be fraudulent.

18. For example, on or about July 1, 2024, Service Representative, Doniella Currithers, contacted Plaintiff regarding an order placed for a medical device fitting for a patient residing in St. John's Riverside Hospital—a territory only covered by Plaintiff. Plaintiff did not request this order, and it was unusual for an order to be placed in another manager's territory.

19. Immediately, Plaintiff called the account coordinator, Brian Plocha, and requested the order form and the patient's medical records to investigate.

20. After reviewing and comparing records, Plaintiff discovered that then-Territory Manager, Martin Bowker, had ordered the device fitting for the patient under the care of Cardiologist, Jay Doshi, M.D.

21. At first, Plaintiff believed this was another attempt by Mr. Bowker to steal credit from Plaintiff by placing an order for a patient within her territory as he had done a few months prior.[2]

22. Nevertheless, giving Mr. Bowker the benefit of the doubt, Plaintiff assumed the order was a mistake, since Dr. Doshi worked at two hospitals, one within Plaintiff's territory and one within Mr. Bowker's territory.

23. However, upon further inspection, Plaintiff noticed that the consenting signature of Dr. Doshi on Mr. Bowker's order form looked different, having had Dr. Doshi sign her own order forms numerous times.

24. Plaintiff then compared Dr. Doshi's signatures on her order forms with Mr. Bowker's order form and found that the signatures did not match. Therefore, Plaintiff reasonably believed that Mr. Bowker forged Dr. Doshi's signature.

25. Thus, Plaintiff was concerned that forging a doctor's signature on a medical device order form, likened to forging a medical prescription, was fraudulent and could raise serious violations of the Food and Drug Administration ("FDA"), Centers for Medicaid and Medicare ("CMS"), Office of Inspector General ("OIG"), as well as insurance fraud.

26. Accordingly, Plaintiff immediately called and forwarded the order form and patient records to her direct supervisor, former Regional Manager-New England Central, Mary Pat Tortora.

27. Plaintiff stated to Ms. Tortora, "Look, an order came in. [Mr. Bowker] specifically sent it in, and had it mapped to his territory, and the order form itself, **the signature is questionable. The patient is in my hospital**. **I think the order form looks a bit strange**." Ms. Tortora gasped and said, "**He definitely signed that himself!**" Plaintiff replied, "That's what I'm assuming. **It doesn't look like [Dr. Doshi]'s previous signatures I've seen**."

---

[2] Previously, at that time, Defendant ZOLL resolved the issue by simply crediting the order to Plaintiff.

28. Ms. Tortora said that she would escalate Plaintiff's complaint to leadership. Ms. Tortora later told Plaintiff that she had escalated her complaint to Mr. Bowker's supervisor and Regional Manager, Lauren Schlenger, Area Sales Director, Dan Sauda, and Regional Director, Mike Yakos.

29. The following week, Ms. Tortora called Plaintiff and said, "[Mr. Yakos] spoke to [Mr. Bowker] and you will be getting credit for the order." Plaintiff replied, "That's it?" Then, Ms. Tortora said, "**[Ms. Schlenger] was not happy that you made this an issue, and she said that [Mr. Bowker] doesn't like you anyway**."

30. On or about November 18, 2024, Ms. Tortora called Plaintiff and said, "**You have a target on your back**. **Start getting your resume in order**. **[Mr. Sauda] wants you out**."

31. Then, on or about November 25, 2024, Mr. Sauda called a team meeting to announce Ms. Tortora's termination and claimed it was due to poor performance. The team was surprised because the region was successful from a sales standpoint.

32. In reality, Defendant ZOLL terminated Ms. Tortora for exposing its fraudulent activity and swept Plaintiff's complaint under the rug.

33. Thus, between Ms. Tortora's warnings of Plaintiff "having a target on her back" for reporting, and Ms. Tortora's subsequent termination, Plaintiff also feared retaliation.

34. Then, in or around the end of January 2025, Plaintiff learned that *Mr. Bowker*, the very person that she reported for fraudulent forging, would be *promoted* to regional manager of *Plaintiff's* territories.

35. Accordingly, on or about February 24, 2025, Mr. Sauda officially announced Mr. Bowker as Regional Manager-New England Central.

5

36. However, Plaintiff felt that Mr. Bowker's now supervisory authority over her was retaliation for reporting him.

37. Therefore, the next day, Plaintiff told Mr. Bowker and Territory Manager, Stephanie Dixon, "**I am really nervous to have [Mr. Sauda] at my field day tomorrow. I have been told he doesn't really like me. Our previous manager told me that he didn't like me and that I have a target on my back**." Mr. Bowker dismissed her concerns and told her not to worry.

38. The following day, Mr. Sauda conducted a "field day" with Plaintiff and rode along with her to all of her work appointments. While sitting in the hospital cafeteria, Mr. Sauda said, "**I want to address something that you shared with [Mr. Bowker]. I can neither confirm nor deny what was directly said because the other person is no longer with the company to be part of the discussion**." Plaintiff responded, "I appreciate you addressing that with me."

39. Mr. Sauda then asked about Plaintiff's sales figures, and she shared with him the data discrepancies which she had previously shared with Mr. Bowker. Plaintiff said, "My orders have gone up. Something is wrong." After showing Mr. Sauda her own data records, Mr. Sauda replied, "If those were your numbers, that would be great." He then told her to call IT to figure it out and commented, "**It's clear you have really good relationships here. They like you, it's clear**. I go to the hospital with other people, and you could tell they never stepped foot into the hospitals. Use your relationships to your advantage." Notably, Mr. Sauda did not provide any negative performance feedback.

40. However, on or about February 27, 2025, Mr. Sauda emailed Plaintiff, copying Mr. Bowker, with the subject line, "Field Day-2/26/25." In that email, Mr. Sauda divulged Plaintiff's performance evaluations over the past four years. Specifically, he stated, "You have missed quota each of those four years," when, in fact, Plaintiff had met at least 95% of her goals for

the last four years, excluding 2022 (in which she had personal matters that her managers at the time knew about). Moreover, there were no set percentages of quotas to meet, and to receive a bonus only required meeting 80% of goals.

41. Furthermore, Plaintiff had never received negative feedback or written warnings regarding her performance. Mr. Sauda also failed to mention the positive feedback regarding Plaintiff's strong relationships that he had observed.

42. Then, on or about February 28, 2025, Mr. Bowker called Plaintiff and stated, "**[Mr. Sauda] made a comment regarding your childcare and not starting at 9:00am**," which Plaintiff believed to imply that her childcare was interfering with her ability to be on time. However, Plaintiff was confused because field start time varies based on accounts, and she had never brought up childcare issues with Mr. Sauda, nor had she ever asked for accommodation regarding childcare.

43. Then, on or about March 4, 2025, Mr. Bowker emailed Plaintiff a recap from their phone conversation that outlined her negative performance feedback. Plaintiff responded with a proposed business plan on how to improve her numbers, but insisted, "**I want to clarify that childcare has never impacted my ability to perform in the role. You mentioned it as a concern of yours and [Mr. Sauda's] on our call on Friday**." Knowing that Plaintiff is a single mother, this comment was clearly discriminatory and would not have been made to a man. Mr. Bowker did not respond to Plaintiff's business proposal.

44. **In reality, Mr. Bowker and Mr. Sauda were retaliating against Plaintiff for exposing Mr. Bowker's fraudulent forgery**.

45. On or about March 7, 2025, Defendant ZOLL held a Quarterly Business Review meeting where each territory manager presented on how the territory was doing and how it could be

7

      improved.  Present in this meeting were Territory Managers, Melissa Bloom, Stephanie Dixon, Steven DeMaio, Robert Trajkovski, and Associate Territory Manager, Stephanie Pelletier.

46. During Plaintiff's presentation, she attempted to address the data discrepancy with her sales figures, but Mr. Bowker rejected her figures and stated, "**No, the numbers are what they are. That's it.  They are not wrong**."

47. Ironically, during this meeting, Mr. Bowker randomly stated, "**My team and I did some shady shit**," but did not elaborate.

48. Then, on or about March 10, 2025, during a Zoom call, Mr. Bowker emailed Plaintiff a Performance Improvement Plan ("PIP").  However, this was pretext.  Notably, HR was not present for the Zoom call nor were they copied on the email, as per company policy.

49. In reality, Mr. Bowker, now being in a position of power over Plaintiff, gave him the perfect opportunity to continue to retaliate against Plaintiff for exposing his unlawful conduct.

50. Further, despite Mr. Bowker's accusations in the PIP, he never once observed her in the field, notwithstanding her frequent requests that he do so, and yet he had ridden with others on multiple occasions.

51. Therefore, Plaintiff reasonably believed that the PIP was further retaliation for disclosing Mr. Bowker's fraudulent behavior and to push Plaintiff out.

52. As a result, on or about March 17, 2025, Plaintiff experienced a panic attack and went to urgent care.

53. The following day, Plaintiff emailed Senior HR Business Partner, Lisa Westwood, in addition to Mr. Bowker, to request FMLA-protected leave "due to a serious health condition."

54. Accordingly, on or about March 18, 2025, Plaintiff took FMLA-protected leave.

55. On or about April 28, 2025, Director of Global CPG Operations, Julie Cole, reached out to Plaintiff, *while she was still on leave*, to discuss a "compliance" concern that was raised in Plaintiff's area.

56. Accordingly, on or about May 4, 2025, assuming the "compliance" concern was the same concern that Plaintiff had raised in July 2024, Plaintiff responded to Ms. Cole's email, stating:

    "I also feel it is important to share that, **despite currently being on medical leave due to mental, emotional, and physical distress caused by the actions of leadership**, I have been made aware that **[Mr. Bowker] has been making** inappropriate comments about me. These comments include **false statements and suggestions regarding my mental well-being**. **I believe these statements may be retaliatory in nature and connected to the compliance concern I** raised in good faith last year regarding a questionable physician signature on a medical device order.

    The nature of the continued commentary about me suggests that retaliation may still be ongoing, and I am increasingly concerned about what appears to be a broader pattern of behavior from individuals in leadership roles."

57. Specifically, Plaintiff learned that Mr. Bowker told other Defendant ZOLL employees that Plaintiff "may be bipolar," was "unhinged," and that he will "sue her for defamation of character."

58. On or about May 8, 2025, Plaintiff reluctantly joined the call with Ms. Cole, Ms. Westwood, and Compliance and Privacy Investigator, Kayleigh Anglum where Ms. Cole asked Plaintiff, "Were you ever concerned about fraudulent orders from Dr. Doshi?" Plaintiff responded, "Yes," and reiterated the events from July 2024 when Plaintiff raised concerns that Mr. Bowker forged Dr. Doshi's signature on a medical device order form.

59. Specifically, Plaintiff stated, "**I looked at the order and the signature was very different**. I told [Ms. Tortora]. [Ms. Tortora] took it to her leadership and [Mr. Bowker's] manager. Nothing was done about it. [Ms. Tortora] was told [Mr. Bowker] was addressed and it

wouldn't happen again, and I'd get the credit for the order . . . **I thought I was doing the right thing by reporting potential fraud and forgery to my manager**."

60. On or about May 12, 2025, Ms. Westwood reached out *again* to discuss the concerns that Plaintiff raised during the May 8, 2025 phone call. However, feeling that her concerns fell on deaf ears, Plaintiff declined to speak.

61. Finally, on or about July 14, 2025, as a result of Defendant ZOLL's intolerable treatment of Plaintiff, Plaintiff resigned.

62. As a result of the acts and conduct complained about herein, Plaintiff has suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails.

63. As a result of Defendant ZOLL's actions, Plaintiff felt, and continues to feel, extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

64. As a result of Defendant ZOLL's discriminatory and intolerable treatment of Plaintiff, he has suffered and continues to suffer severe emotional distress and physical ailments.

65. As a result of the acts and conduct complained of herein, Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

66. Defendant ZOLL's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

### AS A FIRST CAUSE OF ACTION
### UNDER THE FAMILY AND MEDICAL LEAVE ACT
### <u>RETALIATION AND INTERFERENCE</u>

67. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

68. § 2615 of the FMLA states as follows:

    a. Interference with rights

        (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this chapter.
        (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

69. Defendant ZOLL interfered with Plaintiff's rights under the above section, when it contacted Plaintiff during her FMLA-protected leave, to participate in an internal investigation.

70. Defendant ZOLL also retaliated against Plaintiff by disrupting her FMLA-protected leave and allowing Mr. Bowker to make discriminatory comments about Plaintiff regarding her mental health while she was on medical leave.

## AS A SECOND CAUSE OF ACTION
## UNDER THE NEW YORK STATE EXECUTIVE LAW
## <u>DISCRIMINATION</u>

71. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

72. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's … sex [and] disability … to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

73. Defendant ZOLL engaged in an unlawful discriminatory practice by discriminating against Plaintiff on the basis of her sex and actual and/or perceived disability, together with creating a hostile work environment, retaliation, whistleblower retaliation, and constructive discharge.

11

74. Plaintiff hereby makes a claim against Defendant ZOLL under all of the applicable paragraphs of Executive Law Section 296.

### AS A THIRD CAUSE OF ACTION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
### DISCRIMINATION

75. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

76. The Administrative Code of City of New York, Title 8, §8-107 [1] provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee of agent thereof, because of the actual or perceived … sex [and] disability … of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

77. Defendant ZOLL engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions and otherwise discriminating against Plaintiff on the basis of her sex and actual and/or perceived disability, together with creating a hostile work environment, retaliation, whistleblower retaliation, and constructive discharge.

### AS A FOURTH CAUSE OF ACTION
### UNDER THE NEW YORK LABOR LAW
### NYLL RETALIATION

78. Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein.

79. New York Labor Law § 740 states, in pertinent part,

> 2. Prohibitions. An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee does any of the following:

12

> (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety;
> (b) …
> (c) objects to, or refuses to participate in any such activity, policy or practice.

80. Defendant ZOLL engaged in an unlawful employment practice by retaliating against Plaintiff because she reported, disclosed and/or objected to or refused to participate in, a practice of her employer which she reasonably believed to be a violation of law, rule or regulation.

**WHEREFORE,** Plaintiff respectfully requests a judgment against Defendant ZOLL:

A. Declaring that the Defendant ZOLL engaged in an unlawful employment practice prohibited by the FMLA, NYLL § 740, NYSHRL, and NYCHRL, by discriminating against her on the basis of her sex/gender and actual and/or perceived disability, together with creating a hostile work environment, retaliation, whistleblower retaliation, and constructive discharge;

B. Awarding damages to Plaintiff, for all lost wages and benefits, past and future, back pay and front pay and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practice;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff liquidated damages;

F. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

G. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendant ZOLL's unlawful employment practices.

## **JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff demands judgment against Defendant ZOLL in an amount to be determined at the time of trial plus interest, punitive damages, liquidated damages, attorneys' fees, costs, and disbursements of action; and for such other relied as the Court deems just and proper.

Dated: October 2, 2025
New York, New York

**PHILLIPS & ASSOCIATES, PLLC**
*Attorneys for Plaintiff*

By: */s/ Jesse S. Weinstein, Esq.*
Jesse S. Weinstein, Esq.
45 Broadway, 28th Floor
New York, NY 10006
(212)-248-7431